UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JERRY GEORGE WOOD, JR.,

                Petitioner,

     v.

JASON BENNETT,

                Respondent.

CASE NO. 2:23-CV-877-JCC-DWC

REPORT AND RECOMMENDATION

Noting Date: February 16, 2024

      The District Court has referred this action to Chief United States Magistrate Judge David W. Christel. Petitioner Jerry George Wood, Jr., proceeding with retained counsel, Neil Fox, filed his federal habeas petition, pursuant to 28 U.S.C. § 2254, seeking relief from his state court convictions and sentence. *See* Dkt. 1. The Court concludes the state court's adjudication of the three grounds raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends the Petition be denied and a certificate of appealability not be issued.

REPORT AND RECOMMENDATION - 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## I.      Background

### A.  Factual Background

On November 7, 2019, in the Superior Court of Washington for Snohomish County ("trial court"), a jury found Petitioner guilty of soliciting first degree murder and soliciting first degree kidnapping. Dkt. 12-1 at 2 (Exhibit 1). On November 21, 2019, Petitioner also pled guilty to third degree assault. *Id*. The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

> On January 14, 2017, K.M. met Wood and his friend, Abdulaziz Mohamed, in a Shoreline bar. K.M. testified she left the bar with them when they offered to drive her home. Mohamed, however, testified that K.M. agreed to travel to Arlington with the men to visit Wood's friend Rick Walton.
>
> K.M. testified that when she got into the front passenger seat of Wood's car, Mohamed was in the driver's seat and Wood was in the back. She turned to thank Wood for giving her a ride home, and he punched her in the face. According to K.M., Wood then pulled her into the back seat, grabbed her by the hair, and forced her to perform oral sex on him.
>
> Mohamed described these events differently. He testified that Wood was initially in the driver's seat and there was no physical altercation between Wood and K.M. as they drove to a gas station in Everett. En route, Mohamed switched seats with Wood and took over driving. K.M. moved to the back seat with Wood when Mohamed got into the driver's seat. Mohamed described Wood as "drunk and excited" because he thought he was "going to do something sexual with this girl tonight." When they stopped at the gas station, Wood became agitated, and Mohamed described Wood's mood as having "changed."
>
> Wood instructed Mohamed to head to Walton's house. As Mohamed drove north on Interstate 5, he realized Wood was very mad. He heard Wood begin to argue with K.M. and could feel the car shaking. When he looked back to see what was happening, he saw Wood had placed K.M. in a headlock. Mohamed attempted to grab Wood's arm to stop him from assaulting K.M. but was unsuccessful.
>
> When Mohamed tried a second time to separate Wood and K.M., Wood showed him a gun. Mohamed became frightened for both himself and K.M. K.M. appeared scared and began screaming. Mohamed did not feel he could stop in the middle of the road and leave K.M. with Wood, so he decided to "punch the gas" and get to Walton's house "to get [K.M.] to some safe place." Mohamed called Walton before arriving to tell him they were on their way.

Once they arrived at Walton's house, Mohamed got out of the car in a panic and went to find Walton. Mohamed told Walton that Wood was in the car getting violent with K.M. and asked him to intervene. Together, they planned a way to get K.M. to safety and to get Wood off the property.

According to K.M., after Mohamed got out of the car, Wood ripped off her pants and underwear and forced her to have vaginal sex with him. Wood disputed K.M.'s version of events. He testified that they engaged in consensual intercourse and after they finished, K.M. asked Wood to take her home. When he refused, she hit him in the face. Wood admitted he became angry at K.M. and hit her in the face.

When Mohamed returned to the car, he found K.M. sobbing and naked from the waist down, with blood on her chest and marks on her face. Walton's girlfriend, Tara Lien, helped Mohamed get K.M. out of the car and into the house. K.M. realized at that point that she was not wearing any underwear or pants. Mohamed reached into the car to grab K.M.'s pants and purse and helped K.M. get dressed. He described her as "in distress ..., very confused, and shaking, [and] it was hard for her to stand straight." Wood remained in the back seat of his car.

K.M. recalled entering Walton's house, lying down on a couch, and seeing blood on her jacket and clumps of her hair on her clothes. K.M. insisted she did not want to call 911, and Lien used K.M.'s cell phone to call Amber Simpson and Jay Gaudina, K.M.'s friends, to ask them to come and take K.M. home.

Walton wanted Wood off his property. Once he knew K.M. was safely inside the house, Walton convinced Wood to accompany him and Mohamed to a nearby casino. Walton and Mohamed left in Walton's car, and Walton's friend drove Wood's car because Wood had, by this time, passed out in the back seat.

Simpson and Gaudina picked K.M. up from Walton's house and drove her to a friend's nearby home. They later took her to the hospital because of the severity of K.M.'s injuries. K.M. had visible bruises under her nose, on her right eyelid, and around her mouth. Her lip was swollen and bleeding. At the hospital, the forensic nurse who examined K.M. noted bruising and redness over her right cheek and eyelid, blood in her right eye, and a disruption to the skin of her vagina. Semen samples collected from K.M.'s vagina and from the back of the car were consistent with Wood's DNA.

When the police subsequently executed a search warrant at Wood's home, they discovered the underwear K.M. had been wearing that night and her credit card in Wood's bedroom. They also found K.M.'s hair in the back seat of his car. On February 3, 2017, the State charged Wood with a single count of second degree rape by forcible compulsion under RCW 9A.44.050(1)(a).

In January 2018, while in the Snohomish County Jail awaiting trial, Wood was confined in a maximum security unit known as "the hole" at the same time as

Anthony Baldonado, a man Wood had met in jail in 2017. Baldonado, who was trying to raise money for bail, testified that Wood promised to help him with bail money if Baldonado would help Wood with something. Wood asked Baldonado how much he needed and told him he would have the money dropped off with a bail bond company.

Later, Wood left the unit for a visit, and when he returned, he told Baldonado that the money had been dropped off. Baldonado asked Wood if he had anything to read. Wood said he would give a book to a corrections officer to pass to Baldonado. A few hours later, while he was reading the book, Wood instructed Baldonado to flip to specific pages to receive a message from Wood. Baldonado followed Wood's directions and found "little sentences" handwritten in between the paragraphs of the book. Later that same day or the next day, Baldonado received a second book from Wood containing additional messages.

Wood's notes included descriptions of K.M., her house and address, and instructions to "make her disappear by any means."

Wood stressed how important it was for K.M. to "disappear before the 5th" (Wood's trial date), and that Wood was relying on Baldonado. He told Baldonado to "babysit [her] for 40 days" or administer a lethal dose of heroin. The notes informed Baldonado that K.M. lived with her father and told him that "if the dad say[s] she is not there go in the house anyway [be]cause he's lying." Wood promised rewards including the money Baldonado needed for bail "plus a car and 200 a day to babysit for 40 days." Wood assured Baldonado that "you wont [sic] have to worry about shit [be]cause I got you with whatever work, money, house anything." A handwriting expert confirmed that Wood had written these notes.

At the same time that Wood passed these notes to Baldonado, Wood's mother, Shirley Malone, paid $450 toward Baldonado's bail. When Baldonado learned he was going to be released, he tore Wood's notes out of the books, intending to turn them over to his lawyer to get a deal on his pending charges. Jail staff, however, stopped Baldonado as he was leaving the jail and seized the notes. Baldonado later disclosed to law enforcement that Wood had asked him to kill or kidnap K.M. and explained how Wood had instructed him on how to read his handwritten notes on the pages Baldonado had removed from the two paperback books. The jail found one of the two books Wood had delivered to Baldonado and verified that the torn pages Baldonado had in his possession came from the book. Baldonado subsequently entered into a plea agreement on unrelated gun charges in which he agreed to testify against Wood.

Based on Wood's notes and Baldonado's statement to the police, the State amended the charges against Wood to include one count of criminal solicitation of first degree murder under RCW 9A.28.030(1) and RCW 9A.32.030(1)(a) and one count of solicitation of first degree kidnapping under RCW 9A.28.030(1) and RCW 9A.40.020.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

After entering his guilty plea, Baldonado was incarcerated in the Washington Corrections Center (WCC) in Shelton. Wood's friend and fellow gang member, Andrew Tisdale, was incarcerated at the WCC at the same time. Wood sent a letter to Tisdale identifying Baldonado as a snitch in his case. In February 2019, several WCC inmates told Baldonado that Tisdale knew he was a snitch and showed him paper work from Wood's criminal case in which Baldonado was identified as a witness. Handwritten notes on the pleadings, subsequently determined to be Wood's handwriting, identified witness "A.B." as Baldonado and called him a "rat." The inmates informed Baldonado that Tisdale wanted him to write an affidavit retracting any statement he had given police about Wood. They instructed him to say he had lied and "was only cooperating with the DA in order to get a deal out of [his] prison sentence." Although he initially refused, Baldonado came to believe that "they were going to try to jump" him if he refused. Tisdale wrote out what he wanted the affidavit to say, and Baldonado copied it in his handwriting. Baldonado had his signature notarized in the law library and returned the affidavit to Tisdale.

Tisdale then spoke with Malone on a recorded jail phone call to tell her that he had obtained Baldonado's affidavit and, at her instruction, mailed the affidavit to Wood's defense counsel, Walter Peale. Peale provided a copy of the affidavit to the State. At the same time, Baldonado sent a letter to the prosecutor explaining what had occurred in the WCC. Baldonado also forwarded to the prosecutor the documents Tisdale had given him that identified him as a "rat."

Approximately six months later, the prosecutor asked Peale if he could see the original affidavit and the envelope in which it had arrived for purposes of handwriting analysis. When Peale retrieved the original documents, he noticed for the first time that there was a letter from Tisdale (the Tisdale Letter) addressed to Wood inside the envelope. The Tisdale Letter read:

> K-Doe [Fn. "K-Doe" is Wood's street name. Baldonado knew Wood by this nickname]

> This should help you out with your legal troubles. If there's anything else I can do let me know. ...I'm in here doing bad so if you can shoot a female my way or put a lil something on my media via JPay I would appreciate it. But I did this off the strength.

> Lil' Sleepy [Fn. Tisdale went by the monikers of "Sleep" or "Sleepy."]

Peale did not give the Tisdale Letter to Wood, believing that it would be a violation of a court order prohibiting Wood from communicating with anyone other than his legal team. Peale did, however, provide a copy of the letter to the State. The State then amended the information against Wood to include a fourth charge for conspiracy to intimidate a witness under RCW 9A.28.040 and RCW 9A.72.110(1).

1

2

3

During pretrial motions, the topic of the Tisdale Letter arose in the context of a discussion about whether the State intended to introduce evidence that Wood had a gang affiliation. The State argued that evidence that Wood and Tisdale shared a gang affiliation was relevant to the conspiracy charge. The prosecutor stated:

4

5

6

7

[T]his didn't come together entirely until just recently when Mr. Peale finally submitted the letter that he had received from Mr. Tisdale weeks before, and hadn't provided the first time I requested it – the first time he sent things. It was only after I noticed that the return address on the envelope in his first submission to me was missing that I inquired of it, suspecting that this letter had come from Mr. Tisdale. And then it was sent with this letter from Mr. Tisdale to Mr. Wood, which solidified the gang connection that was apparent before, but not nearly as clear.

8

9

10

11

The prosecutor said the State intended to call the lead investigator, Detective Betts, to testify about Wood's gang affiliation connecting him to Tisdale. Wood objected to having a detective testify about gang affiliations and sought to exclude this evidence. The trial court reserved ruling on the admissibility of any gang affiliation between Wood and Tisdale to give Peale time to interview Detective Betts on this topic. Peale did not seek to exclude the Tisdale Letter or any testimony relating to it.

12

13

14

15

When the prosecutor referred to the Tisdale Letter in his opening statement, Wood moved for a mistrial. Peale argued that the prosecutor had suggested in his opening remarks that Wood had received the Tisdale Letter and the only way to refute this suggestion was for Peale to testify that he had intercepted the letter and Wood had never received it. The State argued that mistrial was unnecessary and offered to stipulate that Wood never received the letter.

16

17

The trial court denied the motion for mistrial. Peale then asked the court to appoint independent counsel to advise Wood on what he perceived as a conflict of interest. Although the trial court saw no actual conflict of interest, it agreed to appoint independent counsel to evaluate the issue with Wood.

18

19

20

21

22

Trial continued, and three days later, the court heard argument from the parties and Pete Mazzone, Wood's newly appointed conflict counsel. Mazzone contended there was a conflict of interest. He argued Peale violated the Rules of Professional Conduct (RPC) by disclosing evidence that implicated Wood and, by doing so, made himself a potential witness in the case, thereby hindering Wood from presenting a complete and proper defense. Wood, through Mazzone, indicated he did not wish to continue with Peale representing him on the solicitation and witness intimidation counts because "that would necessarily impede his ability to present a full and proper defense."

23

24

The trial court concluded that there was no conflict with regard to the rape or solicitation charges because the Tisdale Letter was immaterial to these crimes. The

REPORT AND RECOMMENDATION - 6

court then excluded all evidence regarding the Tisdale Letter in order to resolve any potential conflict with regard to the remaining conspiracy charge. The court denied Peale's request to withdraw and declined to appoint new counsel.

The jury convicted Wood of solicitation of first degree murder and solicitation of first degree kidnapping, but acquitted him of conspiracy to intimidate a witness. The jury did not reach a verdict on the charge of second degree rape. Wood subsequently pleaded guilty to a reduced charge of assault in the third degree rather than face retrial on the rape charge. Wood was sentenced to 273 months of confinement and 36 months of community custody on the solicitation convictions. Less than a month after the judgment and sentence was entered, Wood filed a motion for a new trial under CrR 7.5 and CrR 7.8, claiming he had newly discovered exculpatory evidence. The trial court denied his motion for a new trial.

*State v. Wood*, 19 Wash. App. 2d 743, 750–58 (2021); *see also* Dkt. 12-1 at 25-34 (Exhibit 2).

B. <u>Procedural Background</u>

1. *Direct Appeal*

On November 21, 2019, the trial court sentenced Petitioner to total confinement of 273 months. Dkt. 12-1 (Exhibit 1). Following the denial of his motions for a new trial and vacatur of judgment, Petitioner filed a consolidated appeal in the state court of appeals. *See* Dkt. 12. The state court of appeals denied Petitioner's claims, affirmed his convictions, reversed his sentence, and remanded for resentencing with instruction to the trial court to determine if Petitioner's out-of-state convictions were comparable to Washington offenses and properly included in his offender score. *See* Dkt. 12-1 (Exhibit 2). Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). *Id*. (Exhibits 13, 14). On March 30, 2020, the state supreme court denied Petitioner's petition for review without comment. *Id*. (Exhibit 15).

2. *Federal Petition*

On June 9, 2023, Petitioner initiated this case. Dkt. 1. In his Petition (Dkt. 1), Petitioner raised the following three grounds for relief:

1.  Petitioner was denied his constitutional right to testify on his own behalf regarding Counts 2 & 3, violating the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution;

2.  Petitioner was denied his right to counsel under the Sixth Amendment because of a conflict of interest; and

3.  Petitioner was denied effective assistance of counsel in violation of the Sixth Amendment when his attorney did not use due diligence to locate an exculpatory witness before trial.

Dkt. 1 at 5, 7-8. On September 13, 2023, Respondent filed, and served on Petitioner, an Answer to the Petition. Dkts. 11, 12. In the Answer, Respondent asserts the state court's adjudication of the three grounds raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 11. Petitioner filed a traverse on October 2, 2023. Dkt. 14.

## II.    Discussion

Respondent maintains the state courts' adjudication of the grounds raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 11.

A.    Standard of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts

1  "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite
2  result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

3        Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply
4  because that court concludes in its independent judgment that the relevant state-court decision
5  applied clearly established federal law erroneously or incorrectly. Rather, that application must
6  also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An
7  unreasonable application of Supreme Court precedent occurs "if the state court identifies the
8  correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts
9  of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court
10  decision involves an unreasonable application of Supreme Court precedent "'if the state court
11  either unreasonably extends a legal principle from [Supreme Court] precedent to a new context
12  where it should not apply or unreasonably refuses to extend that principle to a new context where
13  it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529
14  U.S. at 407).

15        The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas
16  courts to presume the correctness of state courts' factual findings unless applicants rebut this
17  presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of
18  state court decisions under §2254(d)(1) is "limited to the record that was before the state court
19  that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

20    B.  Right to Testify (Ground 1)

21        In Ground 1, Petitioner asserts that his constitutional right to testify on his own behalf
22  regarding Counts II and III was violated when the trial court did not reopen the case after both
23  sides rested. Dkt. 1 at 5.

24

The United States Supreme Court has recognized that a criminal defendant has a constitutional right to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987). The Supreme Court has further recognized "that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (citations omitted). However, "the right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' " *Rock,* 483 U.S. at 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). Relevant evidence may be excluded for failure to comply with procedural requirements, and "any number of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of relevant evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (plurality opinion). "While the Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).

In determining Petitioner was not denied the right to testify, the state court of appeals expressly applied the standard set out in *Rock*. Dkt. 12-1 at 46-48. The state court of appeals found:

> Wood next contends that the trial court infringed his constitutional right to testify when, after agreeing that Wood could take the stand and limit his testimony to the rape charge, it then denied his request to reopen the defense case to allow him to testify about the solicitation charges.
>
> " 'A motion to reopen a proceeding for the purpose of introducing additional evidence is addressed to the sound discretion of the trial court.' " <u>State v. Luvene</u>, 127 Wash.2d 690, 711, 903 P.2d 960 (1995) (quoting <u>State v. Sanchez</u>, 60 Wash.

App. 687, 696, 806 P.2d 782 (1991)). To demonstrate reversible error based on a trial court's ruling on a motion to reopen, the appealing party must show both a manifest abuse of discretion and resulting prejudice. State v. Brinkley, 66 Wash. App. 844, 848, 837 P.2d 20 (1992). A trial court abuses its discretion if its decision is based on untenable grounds or untenable reasons. Sanchez, 60 Wash. App. at 696, 806 P.2d 782.

Defendants have a right to testify at trial. Rock v. Arkansas, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); State v. Lee, 12 Wash. App. 2d 378, 387, 460 P.3d 701, review denied, 195 Wash.2d 1032, 468 P.3d 622 (2020). Wood exercised this right but chose to limit his testimony to the alleged rape. After the State and Wood both rested, Wood changed his mind and asked the court to reopen his case to allow him to testify as to the solicitation charges. The trial court denied Wood's motion, finding that reopening the case would prejudice the State because it framed its cross-examination of Wood based on his decision to limit his testimony and it was unable to call rebuttal witnesses, including Baldonado. The trial court further noted that in the two and a half years that the case had been pending, Wood had plenty of time to consider whether he would testify and had been afforded the opportunity to offer "carefully crafted" testimony. The court ultimately ruled that his request was "too late and prejudicial to the State."

The trial court's ruling was supported by tenable reasons. State v. Barnett, 104 Wash. App. 191, 16 P.3d 74 (2001), abrogated on other grounds by State v. Epefanio, 156 Wash. App. 378, 234 P.3d 253 (2010), is instructive. In that case, the trial court explained the right to testify to the defendant, who then made the decision not to exercise that right. Id. at 197, 16 P.3d 74. The defense then rested. Id. The following morning, when the court was prepared to instruct the jury and move to closing arguments, the defendant asked if the court would allow him to testify, explaining that he had been overly emotional the day before. Id. at 197-98, 16 P.3d 74. The trial court refused to reopen the defense case, concluding that the defendant's decision to testify had been thoroughly explored before he had made his decision. Id. at 198, 16 P.3d 74. This court affirmed, concluding the trial court's decision not to disrupt the trial schedule to accommodate the defendant was not an abuse of discretion. Id. at 199, 16 P.3d 74.

Barnett is analogous to this case. Here, as there, Wood made his request after both sides had rested and when the court was preparing to instruct the jury and move to closing arguments. Moreover, Wood had ample time to consider his right to testify and the scope of testimony he wanted to offer. And, unlike the defendant in Barnett, Wood did in fact testify and was allowed to limit that testimony to only one charge. See also United States v. Orozco, 764 F.3d 997 (9th Cir. 2014) (affirming denial of defense request to permit defendant to testify after both sides rested and prosecutor had made closing argument).

Wood argues that the trial court's reasons for denying his request are unsupported by the record. He contends that the court could have granted the State time to

prepare because the jury was available for several more days and that the State presented no evidence on how much time it would need to recall Baldonado. But Wood does not dispute that allowing Wood to retake the stand would have led to a delay in concluding the trial and would have required some level of effort by the State to deal with Wood's untimely request. Wood concedes that "allowing the defense to reopen its case would likely have caused some inconvenience and trial delays for both parties." The record thus supports the trial court's finding of delay and prejudice to the State. The trial court did not abuse its discretion in rejecting Wood's motion to reopen the defense case.

*Wood*, 19 Wash. App. 2d at 768–70 (footnote omitted).

The record shows that Petitioner testified on his own behalf. Dkt. 12-1 at 3174-3229. However, prior to taking the stand, Petitioner asserted his privilege to be free from self-incrimination as to Counts II, III, and IV. *Id*. at 3172. The State agreed to Petitioner's request to provide testimony only as to Count I and agreed not to cross-examine Petitioner regarding Counts II, III, or IV. *Id*. The direct examination, cross-examination, and redirect of Petitioner was limited to Count I. *See id*. at 3174-3229. Petitioner's counsel called one additional witness after Petitioner testified. *See id*. at 3229-39. After Petitioner's last witness testified, the defense rested and the trial court moved to preparing jury instructions. *See id*. at 3249-50.

The trial court was in recess for three days due to the weekend and, when court resumed, Petitioner moved for the trial court to reopen the case and allow Petitioner to testify as to Counts II and III. Dkt. 12-1 at 3291. Counsel for Petitioner recognized that Petitioner had previously been allowed to exercise privilege as to those counts but that it was significant and vital to his defense that he offer testimony. *Id*. Counsel argued that the trial court had the authority to allow either party to reopen the case. *Id*. He posited that the State would not be prejudiced by Petitioner reopening his case. *Id*. at 3292. The State requested the motion to reopen be denied because it was prejudicial to the State. *Id*. at 3293. The State also noted it would not limit its cross-examination if the case were reopened and Petitioner offered additional testimony. *Id*. at 3295.

REPORT AND RECOMMENDATION - 12

1    The trial court ruled that Petitioner had been allowed to, and did, testify in the case. Dkt.

2    12-1 at 3302. The trial court noted that there was a large discussion about the scope of

3    Petitioner's testimony and the State agreed to only question Petitioner as to Count I. *Id.* at 3303.

4    The parties rested and began jury instruction discussions. *Id.* The trial court noted that the case

5    had been pending several years, that Petitioner had plenty of time to consider his testimony, and

6    that counsel and Petitioner likely had many discussions about Petitioner testifying in this case.

7    *Id.* The trial court found Petitioner's testimony was carefully crafted and the examinations from

8    both the prosecution and defense were limited to Court I. *Id.* After finding the State would be

9    prejudiced if the case was re-opened, the trial court determined Petitioner had his opportunity to

10   testify and denied the request to reopen. *Id.* at 3303-04.

11   Petitioner now claims his was denied his right to testify. Dkt. 1. The Ninth Circuit has

12   recognized that a defendant's waiver of his right to testify must be knowing and intentional, but

13   has held that such a waiver need not be explicit. *United States v. Pino-Noriega*, 189 F.3d 1089,

14   1094 (9th Cir. 1999) (citing *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)). Rather,

15   "waiver of the right to testify may be inferred from the defendant's conduct and is presumed

16   from the defendant's failure to testify or notify the court of his desire to do so." *Id.* at 1095

17   (citing *Joelson*, 7 F.3d at 177). A defendant is also "presumed to assent to his attorney's tactical

18   decision not to have him testify." *Id.*

19   Here, the record is clear. Petitioner exercised his right to testify, but chose to limit his

20   testimony, effectively waiving his right to testify as to all the charges against him. Petitioner fails

21   to show the trial court's decision to not reopen the case to allow Petitioner to present additional

22   testimony violated Petitioner's right to testify. *See Neuman v. Rivers*, 125 F.3d 315, 318–19 (6th

23   Cir.1997) (holding that a defendant was not deprived of his right to testify, but instead waived

24

1  the right by waiting to make the request to testify until just before jury instructions). Moreover,

2  Petitioner does not cite any clearly established federal law requiring a trial court to reopen the

3  evidence portion of a trial when a defendant requests the opportunity to provide additional

4  testimony. *See Price v. Miller*, 2017 WL 721101, at *11 (C.D. Cal. Feb. 22, 2017) (finding a

5  petitioner did not cite any clearly established federal law requiring a trial court to reopen the

6  evidence portion of a trial after closing arguments have begun when a defendant requests the

7  opportunity to testify.). Therefore, Petitioner has not shown the state court's decision upholding

8  the trial court's decision to deny the motion to reopen the case to allow Petitioner to provide

9  additional testimony is contrary to, nor involved an unreasonable application of, clearly

10  established Supreme Court precedent. Accordingly, the Court recommends Ground 1 be denied.

11      C.  <u>Right to Conflict Free Counsel (Ground 2)</u>

12         In Ground 2, Petitioner contends he was denied his right to counsel because his attorney

13  had a conflict of interest. Dkt. 1 at 7. The Sixth Amendment right to the assistance of counsel

14  embraces the right to conflict-free and undivided loyalty of counsel. *Wood v. Georgia,* 450 U.S.

15  261, 272, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). To demonstrate a Sixth Amendment violation

16  based upon a conflict of interest, the defendant must show that counsel actively represented

17  conflicting interests and that the conflict adversely affected counsel's performance. *Mickens v.*

18  *Taylor,* 535 U.S. 162, 171–72 & n.5 (2002); *Cuyler v. Sullivan,* 446 U.S. 335, 348–50, 100 S.Ct.

19  1708, 64 L.Ed.2d 333 (1980). Unlike a challenge to a counsel's competency, prejudice is

20  presumed if the defendant demonstrates an actual conflict that adversely affected counsel's

21  performance. *Strickland v. Washington,* 466 U.S. 668, 692 (1984); *Cuyler,* 446 U.S. at 349–50.

22  But, the defendant must show an actual conflict before he is entitled to relief; a merely

23  theoretical division of loyalties is insufficient. *Mickens,* 535 U.S. at 171; *Cuyler,* 446 U.S. at 350.

24

1    The state court of appeals considered Petitioner's claim that his trial counsel had a

2 conflict of interest and stated:

> Wood argues that Peale's disclosure of the Tisdale Letter to the State created an
> actual conflict of interest because he violated RPC 1.6(a) and RPC 1.8(b), placing
> his professional interests ahead of the interests of his client. Wood maintains that
> Peale's representation was impacted by his personal interest because he faced
> potential disciplinary sanctions for turning the Tisdale Letter over to the State.
>
> RPC 1.7(a)(2) provides in pertinent part that a conflict of interest exists if "there is
> a significant risk that the representation of one or more clients will be materially
> limited ... by a personal interest of the lawyer." Under this rule, an actual conflict
> would exist if Peale's personal interests in avoiding disciplinary sanctions
> materially limited his representation of Wood.
>
> We conclude there was no actual conflict here because under well-established
> Washington Supreme Court case law, a defense attorney has a duty to disclose
> incriminating evidence he receives from a nonclient. In <u>State ex rel. Sowers v.
> Olwell</u>, 64 Wash.2d 828, 833, 394 P.2d 681 (1964), attorney Olwell possessed a
> knife that the State suspected Olwell's client had used to stab and kill a man. During
> an inquest, the coroner sent Olwell a subpoena requiring him to produce any knives
> relating to his client. Olwell refused to respond and was held in contempt and
> ordered to spend two days in jail. <u>Id.</u> at 830-31, 394 P.2d 681.
>
> On appeal of the order of contempt, the Supreme Court concluded that the subpoena
> was invalid on its face because it required Olwell to disclose information provided
> to him by his client. <u>Id.</u> at 833, 394 P.2d 681. The court went on to state:
>
>> We do not, however, by so holding, mean to imply that evidence can be
>> permanently withheld by the attorney under the claim of the attorney-
>> client privilege. Here, we must consider the balancing process between the
>> attorney-client privilege and the public interest in criminal investigation.
>> We are in agreement that the attorney-client privilege is applicable to the
>> knife held by appellant, but do not agree that the privilege warrants the
>> attorney, as an officer of the court, from withholding it after being properly
>> requested to produce the same. <u>The attorney should not be a depository
>> for criminal evidence (such as a knife, other weapons, stolen property,
>> etc.), which in itself has little, if any, material value for the purposes of
>> aiding counsel in the preparation of the defense of his client's case.</u> Such
>> evidence given the attorney during legal consultation for information
>> purposes and used by the attorney in preparing the defense of his client's
>> case, whether or not the case ever goes to trial, could clearly be withheld
>> for a reasonable period of time. <u>It follows that the attorney, after a
>> reasonable period, should, as an officer of the court, on his own motion
>> turn the same over to the prosecution.</u>

REPORT AND RECOMMENDATION - 15

1

2    Id. at 833–34, 394 P.2d 681 (emphasis added). Other states have followed the
     reasoning in Olwell. See Morrell v. State, 575 P.2d 1200, 1207 (Alaska 1978)

3    (defense attorney who came into possession of his client's written kidnapping plan
     and disclosed it to the prosecution did not deprive client of right to effective

4    assistance of counsel because "a criminal defense attorney has an obligation to turn
     over to the prosecution physical evidence which comes into his possession,

5    especially where the evidence comes into the attorney's possession through acts of
     a third party who is neither a client of the attorney nor an agent of a client"); Hitch

6    v. Pima County Superior Court, 146 Ariz. 588, 594, 708 P.2d 72 (1985) (defense
     attorney who received victim's watch from client's girlfriend had duty to turn watch

7    over to law enforcement to prevent girlfriend from destroying it; duty of loyalty is
     subordinate to responsibility for proper administration of law).

8    Under Olwell, Peale had a duty to disclose the Tisdale Letter to the prosecution and
     did not violate either RPC 1.6 or 1.8, or his duty of loyalty to Wood, by doing so.

9    Peale knew that the prosecutor suspected Baldonado had been forced to sign the
     affidavit and that the State was investigating Tisdale for witness intimidation. He

10   reasonably believed the letter was material evidence in that investigation. Given
     that the affidavit constituted a recantation of Baldonado's statement incriminating

11   Wood in the solicitation charges, it was foreseeable that the Tisdale Letter might
     be material evidence on the credibility of Baldonado's recantation. Peale also

12   realized that if he forwarded the Tisdale Letter to Wood, he would arguably be
     making Wood into a coconspirator with Tisdale. By refusing to turn the letter over

13   to Wood, Peale acted to advance his client's interests, not undermine them. And
     under the circumstances here, with Tisdale incarcerated and under suspicion for

14   additional criminal activity, it was not a viable option for Peale to return the letter
     to Tisdale.

15
     Finally, Peale turned the letter over only after the prosecutor made a specific request
16   to obtain copies of the materials Peale had received from Tisdale. We have found
     no authority, and Wood cites none, for the proposition that a criminal defense

17   attorney owes a duty to a client to withhold incriminating evidence that comes into
     his possession from a third party when the prosecutor has requested to see it. Peale

18   was obligated to disclose the Tisdale Letter to the prosecutor and doing so did not
     violate any of his ethical obligations to Wood. Because Peale's disclosure did not

19   violate RPC 1.6 or 1.8, he faced no risk of professional discipline and his personal
     interest in avoiding such disciplinary sanctions would not have interfered with his

20   representation at trial.

21   We recognize that when an attorney receives incriminating physical evidence and
     confronts the issue of whether to turn such evidence over to law enforcement, there

22   is a tension between the duty of loyalty the attorney owes to his client and the duty
     of candor the attorney owes to the court. While there is a potential conflict between

23   these duties, the possibility of a conflict is not enough to warrant reversal of a
     conviction. State v. Kitt, 9 Wash. App. 2d 235, 243, 442 P.3d 1280 (2019). Here,

24

the duty of loyalty would not outweigh the duty to respond to the prosecutor's request with full candor, and thus, no actual conflict arose.

. . .

Even if Peale's disclosure of the Tisdale Letter created a conflict of interest, Wood must also show that the conflict either caused some deficiency in representation that affected Wood's interests or likely affected specific aspects of Peale's advocacy on Wood's behalf. State v. Regan, 143 Wash. App. 419, 427, 177 P.3d 783 (2008). The defendant must demonstrate that the conflict "affected counsel's performance—as opposed to a mere theoretical division of loyalties." Dhaliwal, 150 Wash.2d at 570, 79 P.3d 432 (emphasis omitted) (quoting Mickens v. Taylor, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)). No such demonstration has been made here.

Wood argues Peale's disclosure affected his representation because it made him into a necessary defense witness who could have been called to testify at trial. RPC 3.7(a) prohibits an attorney from acting as an advocate in a trial in which the lawyer "is likely to be a necessary witness." But this rule also allows a lawyer to testify about an uncontested issue. RPC 3.7(a)(1). Here, Peale could have testified that he received the letter directly from Tisdale and Wood never received it because the State did not contest these facts. Had this testimony been beneficial to Wood, Peale could have been a witness without violating RPC 3.7.

Moreover, the trial court eliminated the problem by excluding the Tisdale Letter and accepting the State's agreement that it would not elicit any information about it at trial. There was nothing exculpatory in the letter, and once it was excluded in the State's case, we can see no reason why Wood would have wanted to present this evidence in his defense. At that point, Peale was not a necessary witness and, as the trial court noted, any conflict of interest was eliminated. And the jury did acquit Wood of the witness intimidation charge.

Wood contends that Peale would have been an important witness as to Wood's lack of intent on the two solicitation charges. But Wood fails to explain the nexus between Peale's knowledge about the Baldonado affidavit and Tisdale Letter and Wood's state of mind when he recruited Baldonado to kidnap and murder K.M. a year earlier. Peale had personal knowledge as to how the affidavit and letter came to be in the State's possession and he had personal knowledge that Wood did not receive these documents from Tisdale. But Peale had no personal knowledge as to what Wood intended when he talked to Baldonado about K.M.

Finally, Wood maintains Peale should have been permitted to withdraw because Wood lost confidence in Peale's ability to represent him. But a general loss of confidence or trust alone is insufficient to justify granting a motion to withdraw. State v. Stenson, 132 Wash.2d 668, 734, 940 P.2d 1239 (1997). At the time of Wood's request, the case had been pending for two and a half years, a jury had been

empaneled, and jurors had heard three days of testimony. The trial court explored the nature of the alleged conflict and concluded that there was no significant risk that Peale's ability to represent Wood would be impacted or that Wood would otherwise be adversely affected. Because there was no conflict of interest, and no demonstrated impact on Peale's representation of Wood at trial, we conclude Wood was not denied his Sixth Amendment right to effective assistance of counsel.

*Wood*, 19 Wash. App. 2d at 759–64 (footnotes omitted); Dkt. 12-1 at 36-41.

The state court record reflects Petitioner's trial counsel, Walter Peale, received a letter from an inmate, Andrew Tisdale, regarding a witness's recantation. *See* Dkt. 12-1 at 1901. Mr. Tisdale requested Mr. Peale give the letter to Petitioner. Mr. Peale kept the document in his possession and then gave it to the prosecutor when the prosecutor made a request for evidence. *Id*. Because the State made comments about the letter during opening statements, Mr. Peale notified the trial court of a potential conflict because he was a potential witness regarding the letter. Petitioner was assigned potential conflict counsel who indicated Petitioner was willing to proceed with Mr. Peale as counsel so long as Counts II, III, and IV were severed from Count I. *Id*. at 1895, 1904. The State argued that the only way Mr. Peale could be called to testify would be to present testimony regarding from where the letter came and whether Petitioner received it. *Id*. at 1905. The State argued Mr. Peale was not a necessary witness and there was no conflict. *Id*. The State also indicated it did not intend to introduce evidence showing how the State received the letter. *Id*. at 1930. The trial court ruled that there was no conflict of interest and noted that it did not see any sort of significant risk that Mr. Peale's representation of Petitioner would be materially limited. *Id*. at 1932-33. The trial court did not appoint conflict counsel and continued with the trial. *Id*. at 1933.

As stated above, to show a Sixth Amendment violation, Petitioner must show that counsel actively represented conflicting interests and that the conflict adversely affected counsel's performance. *See Mickens,* 535 U.S. at 171–72 & n.5; *Cuyler,* 446 U.S. at 348–50.

1   "[T]he U.S. Supreme Court has not extended *Sullivan* beyond conflicts involving multiple

2   concurrent representations at trial." *Marks v. Davis*, No. 11-CV-02458, 2016 WL 5110641, at *6

3   (N.D. Cal. Sept. 20, 2016). Indeed, in *Mickens*, the Supreme Court "specifically and explicitly

4   concluded that *Sullivan* was limited to joint representation, and that any extension of *Sullivan*

5   outside of the joint representation context remained, 'as far as the jurisprudence of [the Supreme

6   Court was] concerned, an open question.' " *Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir.

7   2005) (quoting *Mickens*, 535 U.S. at 176).

8          The record shows Mr. Peale received a letter from an inmate, Mr. Tisdale, and a

9   declaration from a witness in Petitioner's case recanting his prior testimony. *See* Dkt. 12-1 at

10  1027-29. Mr. Peale provided the declaration to the State, but did not realize the envelope also

11  contained a letter directed to Petitioner from Mr. Tisdale. *Id*. The State requested a clearer copy

12  of the documents and envelope, and, at that time, Mr. Peale found the letter from Mr. Tisdale to

13  Petitioner and provided it to the State. *Id*. Mr. Peale was not called to testify as a witness, nor is

14  there any indication he provided different representation of Petitioner because of the letter.

15  Under the facts of this case, Petitioner has not shown there is clearly established law showing a

16  Sixth Amendment violation occurred. *Hunt v. Virga*, 651 F. App'x 713, 715 (9th Cir. 2016) ("It

17  is not clearly established that the *Cuyler* framework applies to instances in which counsel's

18  purported conflict of interest was personal rather than based on improper joint

19  representation.").Therefore, Petitioner has not shown the state court of appeals decision finding

20  Petitioner was not denied conflict free counsel was contrary to, nor an unreasonable application

21  of, clearly established federal law. Accordingly, the Court recommends Ground 2 should be

22  denied.

23

24

1

   D.  Right to Effective Counsel (Ground 3)

2

       In Ground 3, Petitioner alleges his counsel was ineffective for failing to use due diligence

3

to locate an exculpatory witness before trial. *Id*. at 8.

4

       In *Strickland*, the Supreme Court created a two-part test for determining whether a

5

defendant received ineffective assistance of counsel. 466 U.S. 668. First, a defendant must

6

demonstrate his attorney's performance was deficient, which requires showing "counsel made

7

errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth

8

Amendment." *Id*. at 687. Second, a defendant must demonstrate the deficient performance

9

prejudiced the defense to such a degree the results of the trial cannot be trusted. *Id.*

10

       Under the first prong, the reasonableness of an attorney's performance is to be evaluated

11

from counsel's perspective at the time of the alleged error and in light of all the circumstances.

12

*Id.* at 690. The petitioner must carry a heavy burden, as "reviewing courts must indulge a strong

13

presumption that counsel's conduct falls within the wide range of professional assistance; that is,

14

the defendant must overcome the presumption that, under the circumstances, the challenged

15

action might be considered sound trial strategy." *Id.* at 689 (citation omitted).

16

       Under the prejudice prong, a petitioner must establish there is a reasonable probability the

17

results would have been different but for counsel's deficient performance. *Kimmelman v.*

18

*Morrison*, 477 U.S. 365, 375 (1986); *Strickland,* 466 U.S. at 696. "A reasonable probability is a

19

probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[A]

20

court need not determine whether counsel's performance was deficient before examining the

21

prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to

22

dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course

23

should be followed." *Id.* at 697.

24

1    In determining Petitioner's counsel was not ineffective, the state court of appeals

2    expressly applied the *Strickland* standard and found:

3    > [Petitioner] alternatively contends that his attorney's failure to exercise due
   > diligence in searching for Ruiz constitutes ineffective assistance of counsel.

4
5    > Under the Sixth Amendment to the United States Constitution and article I, section
   > 22 of the Washington State Constitution, a defendant in a criminal proceeding is
   > guaranteed the right to effective assistance of counsel. Strickland v. Washington,
6    > 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171
   > Wash.2d 17, 32, 246 P.3d 1260 (2011). To establish ineffective assistance of
7    > counsel, a defendant must demonstrate both (1) that counsel's representation fell
   > below an objective standard of reasonableness and (2) that counsel's representation
8    > resulted in prejudice, i.e., a reasonable probability that, but for counsel's deficient
   > performance, the result of the proceeding would have been different. State v.
9    > McFarland, 127 Wash.2d 322, 334-35, 899 P.2d 1251 (1995). Because the
   > defendant must show both prongs, a failure to demonstrate either prong will end
10   > the inquiry. State v. Classen, 4 Wash. App. 2d 520, 535, 422 P.3d 489 (2018).

11   > Deficient performance occurs when counsel's performance cannot be attributed to
   > any conceivable legitimate tactic. State v. Carson, 184 Wash.2d 207, 218, 357 P.3d
12   > 1064 (2015) (quoting Grier, 171 Wash.2d at 33, 246 P.3d 1260). There is a strong
   > presumption that counsel exercised reasonable professional judgment to render
13   > adequate assistance. Id. at 216, 357 P.3d 1064. To rebut this presumption, the
   > defendant has the burden to establish that there are no legitimate strategic or tactical
14   > reasons explaining counsel's performance. McFarland, 127 Wash.2d at 335-36, 899
   > P.2d 1251.

15
16   > Wood argues that the failure to exercise due diligence in searching for a potential
   > witness is deficient performance. The State, by contrast, argues that defense counsel
   > made a reasonable, tactical decision to prioritize his time and resources on other
17   > aspects of Wood's defense. We agree with the State.

18   > Wood relies on State v. Jones, 183 Wash.2d 327, 352 P.3d 776 (2015), for the
   > proposition that a lawyer's failure to interview a witness amounts to deficient
19   > performance. But Jones is distinguishable. In that case, Jones was convicted of
   > second degree assault after he fought with another man on a public street. Id. at
20   > 330, 352 P.3d 776. Defense counsel failed to interview several eyewitnesses who
   > were clearly identified in police reports and pretrial discovery. Id. at 332, 352 P.3d
21   > 776.

22   > On appeal, the Washington Supreme Court concluded that "failure to interview a
   > particular witness can certainly constitute deficient performance" but that it
23   > depends on the lawyer's reasons. Id. at 340, 352 P.3d 776. Because trial counsel
   > "offered absolutely no reason" for failing to interview the witnesses, his decision

24

REPORT AND RECOMMENDATION - 21

was not informed and, therefore, could not have been strategic. Id. at 340, 342, 352 P.3d 776. It concluded the attorney's performance was deficient.

Here, Ruiz was not identified in any police reports, and his location and contact information were not readily available to Wood's defense team. When counsel and his investigator were unable to find Ruiz, counsel made an informed choice to focus their resources on locating witnesses to the rape charge. Counsel did so because he considered the rape charge to be "the more serious one, and we thought it required more effort."

This was a reasonable strategic move. Rape in the second degree is a class A felony, RCW 9A.44.050(2), and a "sex offense" subject to an indeterminate sentence with a mandatory maximum sentence of life in prison. RCW 9.94A.507(1)(a)(i); (3)(a), (b); RCW 9A.20.021(1)(a). Wood would have served a life sentence with the possibility, but no guarantee, of an earlier release. While solicitation to commit murder in the first degree is also a class A felony under RCW 9A.28.030(2) and RCW 9A.28.020(3)(a), it is not subject to a mandatory life sentence. Wood faced a standard range of 234 to 312 months in prison if convicted of this charge.[FN. The Sate conceded that the two solicitation charges constituted the same criminal conduct and the sentences would run concurrent to each other.].

As the Jones court noted, "[w]e can certainly defer to a trial lawyer's decision against calling witnesses if that lawyer investigated the case and made an informed and reasonable decision against conducting a particular interview or calling a particular witness." 183 Wash.2d at 340, 352 P.3d 776 (emphasis omitted). Here, defense counsel made an informed and strategic decision, given the information available to him. Therefore, we conclude his performance was not deficient and reject Wood's ineffective assistance of counsel claim.

Wood, 19 Wash. App. 2d at 779–81; Dkt. 12-1 at 58-61.

Here, the state court record shows an inmate, Raymond Ruiz, was housed with Petitioner during the time Petitioner solicited Mr. Baldonado to kidnap and murder K.M. See Dkt. 12-1 at 3535. It appears Mr. Ruiz had information that Petitioner had withdrawn his requests to Mr. Baldonado. See id. 3534-35. Prior to trial, Petitioner's trial counsel had received some identification of "Sleep" (aka Raymond Ruiz), but he was out of custody and itinerant. Id. at 3545. Petitioner's trial counsel did not know where Ruiz was located and tried to find him, but the attempts to locate Ruiz were unsuccessful. Id. at 3545-46. The record shows trial counsel's investigator was actively looking for Ruiz, but stopped the effort when he was not located

1   because there were other more pressing matters. *Id.* at 3547. For instance, Mr. Peale was having

2   difficulty bringing forward witnesses for Count I, which Mr. Peale thought was a more serious

3   charge. *Id.* Petitioner's trial counsel was aware of Mr. Ruiz prior to the trial and the defense

4   attempted to locate Mr. Ruiz, but trial counsel did not have contact with Mr. Ruiz, did not know

5   if Mr. Ruiz really existed, and did not know what Mr. Ruiz had heard or would say. *Id.* at 3551.[1]

6   After the trial, Petitioner's defense team located Mr. Ruiz in jail. *Id.* at 3534, 3544-47. At that

7   time, Mr. Ruiz said he heard Petitioner withdraw the request he made to Baldonado and he was

8   prepared to testify regarding what he heard. *Id.* at 3547-48. Mr. Peale then moved for a new trial

9   based on the information from Mr. Ruiz. *See id.* at 3534-51.

10          A defense attorney's duty to investigate and prepare a defense does not require that every

11  conceivable witness be interviewed. *Crittenden v. Ayers,* 624 F.3d 943, 967 (9th Cir. 2010);

12  *Hendricks v. Calderon,* 70 F.3d 1032, 1040 (9th Cir.1995). Counsel's performance "must be

13  examined according to what was known and reasonable at the time the attorney made his

14  choices" and not through the distorting lens of hindsight. *Hendricks,* 70 F.3d at 1036; *Strickland,*

15  466 U.S. at 689–90, 104 S.Ct. 2052; *Pinholster,* 131 S.Ct. at 1403. While preparing for trial, Mr.

16  Peale and his investigator investigated and attempted to locate Mr. Ruiz. They could not find Mr.

17  Ruiz, were not sure he existed, and did not know what information Mr. Ruiz could or would

18  testify about. When Petitioner's trial counsel was unable to locate Mr. Ruiz, he turned his

19  attention and efforts to presenting a defense on a separate charge that carried a longer potential

20  sentence.

21

22

23          [1] This position is supported by Mr. Peale's declaration that was attached to the motion for a new trial. *See*
    Dkt. 6-1 at 7. Petitioner attached the motion for a new trial to his Memorandum in support of his Petition, but the
    motion for a new trial and declaration does not appear to be in the certified start court record. *See* Dkts. 6, 12. Thus,
24  the Court will not rely on it.

REPORT AND RECOMMENDATION - 23

1    The record shows counsel made attempts to locate Mr. Ruiz and, when those attempts

2    were futile, counsel pursued other defenses and witnesses related to the remaining counts.

3    Petitioner has failed to show his counsel's efforts were deficient. Rather, the record reflects that

4    counsel made attempts to locate Mr. Ruiz without knowing his identity and when that was

5    unsuccessful Petitioner's counsel made a strategic decision to pursue more viable avenues of

6    defense. Petitioner has, therefore, failed to demonstrate the state court's conclusion that counsel

7    was not ineffective for failing to further investigate Raymond Ruiz was contrary to, nor an

8    unreasonable application of, clearly established federal law. Accordingly, Ground 3 should be

9    denied.

10    **III.    Evidentiary Hearing**

11    The decision to hold an evidentiary hearing is committed to the Court's discretion.

12    *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

13    hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

14    entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

15    available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

16    state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

17    entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

18    record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

19    court is not required to hold an evidentiary hearing." *Id*. The Court does not find it necessary to

20    hold an evidentiary hearing because, as discussed in this Report and Recommendation,

21    Petitioner's grounds for relief may be resolved on the existing state court record.

22

23

24

1

### IV.    Certificate of Appealability

2      A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

3 court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

4 from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue

5 . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right."

6 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason

7 could disagree with the district court's resolution of his constitutional claims or that jurists could

8 conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-*

9 *El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

10      No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or

11 would conclude the issues presented in the Petition should proceed further. Therefore, the Court

12 concludes Petitioner is not entitled to a certificate of appealability with respect to the Petition.

13   ### V.    Conclusion

14      For the above stated reasons, the Court concludes Petitioner has not shown the state

15 courts' adjudication of the three grounds raised in the Petition was contrary to, nor an

16 unreasonable application of, clearly established federal law. Additionally, an evidentiary hearing

17 is not necessary. Therefore, the Court recommends the Petition be denied and a certificate of

18 appealability not be issued.

19      Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

20 fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

21 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

22 review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

23 objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

24

*Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit February 16, 2024, as noted in the caption.

Dated this 1st day of February, 2024.

David W. Christel
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 26